1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**

9            **EASTERN DISTRICT OF CALIFORNIA**

10

11   VICTORIA BEST,                          )   Case No.: 1:12-cv-01061 - AWI - JLT
                                             )
12              Plaintiff,                   )   FINDINGS AND RECOMMENDATIONS
                                             )   DIRECTING ENTRY OF JUDGMENT IN FAVOR
13        v.                                 )   OF DEFENDANT, COMMISSIONER OF SOCIAL
                                             )   SECURITY, AND AGAINST PLAINTIFF
14   COMMISSIONER OF SOCIAL SECURITY,        )   VICTORIA BEST
                                             )
15              Defendant.                   )
                                             )
16   _____ )

17          Victoria Best ("Plaintiff") asserts she is entitled to benefits under Titles II and XVI of the

18   Social Security Act, and seeks judicial review of the decision denying her applications for benefits.

19   For the reasons set forth below, the Court recommends the administrative decision be **AFFIRMED**.

20                           **<u>PROCEDURAL HISTORY</u>**

21          Plaintiff filed applications for disability insurance benefits and supplemental security income

22   on February 3, 2010, alleging disability beginning June 1, 2004.  (Doc. 14-3 at 11).  The Social

23   Security Administration denied her claims initially and upon reconsideration.  *Id.*  After requesting a

24   hearing, Plaintiff testified before an administrative law judge ("ALJ") on September 13, 2010.  *Id.* at

25   36.  The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order

26   denying benefits on September 15, 2011.  *Id.* at 11-22.  The Appeals Council denied Plaintiff's request

27   for review of the ALJ's decision on April 27, 2012.  *Id.* at 2-4.  Therefore, the ALJ's determination

28   became the final decision of the Commissioner of Social Security ("Commissioner").

                                             1

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f).  The process requires

the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.    Relevant Medical Evidence**

  1.    Treatment notes

Plaintiff visited Spanos Family Practice ("SFP") on January 17, 2005, seeking to establish a primary care physician. (Doc. 14-9 at 48-49). Plaintiff was treated by Dr. Nicole Belissary, who noted Plaintiff complained of a "depressed mood, lack of concentration, guilt/worthlessness, fatigue, loss of interest, irritability, anxiety, feelings of worry, muscle tension and sleep disturbance for the past 1 year." *Id.* at 49. Plaintiff told Dr. Belissary she had suffered deaths of two loved-ones over the past year, which caused her stress. *Id.* Dr. Belissary diagnosed Plaintiff with a severe depressive disorder, not otherwise specified; low back pain syndrome; and reflex sympathetic dystrophy. *Id.* at 50-51.

In September 2005, Plaintiff was admitted to a hospital "due to a suicide attempt." (Doc. 14-9 at 44). She remained in the hospital for three days, and she began to take Paxil for her depression. *Id.*

Plaintiff reported having pain in her back and wrist in February 2006. (Doc. 14-9 at 41). Dr. Anthony Lopresti treated Plaintiff at SFP, and observed Plaintiff walked with an antalgic gait and "appear[ed] to be in mild to moderate pain." *Id.* at 42. She had a reduced range of motion in her spine and an "increased sensitivity to touch." *Id.* Dr. Lopresti diagnosed Plaintiff with a lumbar strain and reflex sympathetic dystrophy. *Id.*

In May 2007, Plaintiff continued to be treated for her pain. (Doc. 14-9 at 34). Plaintiff reported she had "aching, burning" pain in her lower and mid back, but she did not have "radiation of the pain or lower extermity (sic) numbness, tingling or weakness." *Id.* at 34. Dr. Belissary noted Plaintiff was "able to ambulate w/out assistance." *Id.* Plaintiff requested Dr. Belissary complete a form for Plaintiff to receive a DMV disability placard because she felt fatigue when walking to a store from the parking lot, but Dr. Belissary doubted Plaintiff would qualify "given her high level of physical functioning."

*Id.* at 35.  Plaintiff reported she did not have insurance, and declined to continue with therapy or have testing and images taken on her lower back.  *Id.* at 34-35.

Plaintiff returned to SFP for treatment on April 18, 2008, reporting she was "in the process of getting insurance coverage."  (Doc. 14-9 at 29-30).  Plaintiff stated she had been told that she had osteoarthritis, and that the pain was "worse with cold weather and better with heat."  *Id.*  Dr. Belissary noted Plaintiff had "hypertrophy of multiple joints in fingers bilaterally," but otherwise her physical examination was unremarkable.  *Id.* at 31.

Dr. Belissary gave Plaintiff a complete physical exam on September 26, 2008.  (Doc. 14-9 at 20-24).  Plaintiff had "no complaints" at the time of the examination.  *Id.* at 21.  Dr. Belissary found Plaintiff's motor strength was "5/5 x four extremities" and observed her gait was normal.  *Id.* at 24.

In December 2008, Plaintiff reported she had insurance and requested "a referral for her nerves," stating "she has burning in her nerves all over her body, 'from the tip of the skin all the way through [her] nerves.'"  (Doc. 14-9 at 11).  She explained her pain felt like a "'painful electric current' going up and down her back," and sometimes it went "from [her] feet all the way up the leg to her back."  *Id* at 11-12.  Also, Plaintiff complained of having a depressed mood.  *Id.* at 12.  Dr. Belissary recommended Plaintiff "continue pain management" and put her on a "trail (sic) of Cymbalta due to multiple issues including chronic back pain and depression."  *Id.*  at 12-13.

Plaintiff and her mother reported an "improvement of mood with Cymbalta" in February 2009.  (Doc. 14-9 at 6).  Plaintiff told Dr. Belissary she felt severe pain in her right foot and the pain in her fingers was "getting worse."  *Id.*  Dr. Belissary referred Plaintiff to a podiatrist and rheumatologist.  *Id.*  The podiatrist, Dr. Endo, determined Plaintiff had plantar fasciitis and extensor tendonitis in her right foot.  *Id.*  at 3-4.

Dr. Belissary ordered x-rays of Plaintiff's chest in April 2009, which showed "[m]ild osteoarthritis and dextroconvex scoliosis of the thoracic spine."  (Doc. 14-8 at 85-86).  In addition, Plaintiff had images taken of her hands on July 16, 2009.  (Doc. 14-10 at 19-21).  In Plaintiff's left hand, Dr. Macasinag found "[m]oderately severe osteoarthritis of the distal interphalangeal joints of the middle and fourth fingers" and "[m]ild osteoarthritis of the remaining interphalangeal joints."  *Id.* at 21.  In Plaintiff's right hand, Dr. Macasinag found "[m]oderate-to-severe osteoarthritis of the distal

4

interphalangeal joints of the fourth and fifth fingers," and "[m]ild osteoarthritis of the remaining interphalangeal joints." *Id.* at 19.

Plaintiff began treatment with Dr. Hajra Tily on September 3, 2009. (Doc. 14-8 at 59). She told Dr. Tily her pain was "10 out of 10" and that "[a]ny kind of activity like sitting, standing, walking for any length of time makes the pain worse." *Id.* at 55. Plaintiff tested positive at 18 of 18 tender points for fibromyalgia, and Dr. Tily ordered images of Plaintiff's hips, pelvis, and lumbar spine. *Id.* at 58, 61-62. Plaintiff had "[m]ild degenerative spurring in the right SI joint," but had negative results in her hips. (Doc. 14-10 at 18). Also, she had "degenerative changes in the lumbar spine" and "slight sclerotic changes along the sacroiliac joints consistent with arthritis." (Doc. 14-8 at 61).

Dr. Tily believed Plaintiff's psoriatic arthritis was "at least mild to moderately active" in November 2009. (Doc. 14-8 at 8). Plaintiff had a motorcycle accident in October, which caused "a severe flare of fibromyalgia." *Id.* at 20. Plaintiff reported her pain was "usually 8 out of 10," but she had stopped taking Celebrex because it was not covered by her insurance. *Id.* at 8, 20. Dr. Tily found Plaintiff had "pain with range of motion and tenderness at the wrist, elbow and shoulder." *Id.* at 23. In addition, she had "pain with range of motions at the knees and hips." *Id.* According to Dr. Tily, Plaintiff's pain on the right side of her body "was out of proportion to the physical findings." *Id.* at 20.

In January 2010, Dr. Tily noted Plaintiff was taking "significantly less" Hydrocodone than before, and felt an overall "improvement in her symptoms." (Doc. 14-8 at 8). Dr. Tily observed that Plaintiff's knuckles were getting deformed, and she had "chronic bony changes." *Id.* at 9, 12. She again tested positive at 18 of 18 tender points for fibromyalgia testing, but her fibromyalgia symptoms were "overall stable". *Id.* at 11-12. In addition, Plaintiff was tolerating her medication well, without nausea, vomiting, diarrhea, or bone pain. *Id.* at 9. Dr. Tily noted Plaintiff reported "[h]er anxiety and her overall psychiatric issues have been much better" and she was taking Xanax "only on an as needed basis." *Id.* Likewise, Dr. Belissary noted Plaintiff's "[s]ymptoms wax and wane" but "overall … improved over the last several months with treatment." *Id.* at 4.

Plaintiff reported her arthritis was worsening in March 2010, and she had pain in her knuckles, fingers, knees and neck, which was "usually 4 to 5 out of 10." Doc. 14-12 at 22). She told Dr. Tily she had stopped taking Xanax, and that her stomach hurt every time she took medicine. *Id.* Upon

5

examination, Dr. Tily observed Plaintiff had "erythema and chronic bony changes," and she was unable to make a full fist. *Id.* at 25. She had a "good grip" and "good range of motion at the wrist, elbow and shoulder." *Id.* Dr. Tily prescribed Humira as a more aggressive treatment for Plaintiff's psoriatic arthritis. *Id.* at 26. In April 2010, Plaintiff told Dr. Tily she could "barely walk for 15-20 minutes," felt "excruciating pain all over," and had depression and anxiety. *Id.* at 3, 5. Dr. Tily noted she was "not able to make full fists . . . but she does have good range of motion at the wrists, elbows, and shoulders." *Id.* at 6. Plaintiff reported the Humira caused her to be nauseous, but she "was willing to put up with it as it is helping her." (Doc. 14-11 at 26).

In June 2010, Plaintiff reported that "overall her symptoms [were] not any better since she started Humira." (Doc. 14-11 at 51). However, Plaintiff reported "the pain in the hands and knees have been better and they are not as painful," and that "since she is on Humira, she is better able to cope with the pain." *Id.* at 50-51. Dr. Tily observed Plaintiff did not have as much tenderness at the DIP, and was "not having any erythematous changes at the DIP, PIP, or MCP." *Id.* at 53. However, Plaintiff had pain with range of motion at the elbows, shoulders, knees, and hips. *Id.* In September 2010, she reported she was able to "move much better but still the pain is constantly there." *Id.* at 35.

In 2011, Dr. Tily determined Plaintiff's symptoms were improving with Humira. (*See, e.g.,* Doc. 14-11 at 7, 11). For example, in March 2011, Dr. Tily found Plaintiff had "some tenderness to palpation," but he found no evidence of soft tissue swelling in her fingers, wrists, or elbows. (Doc. 14-11 at 18). Plaintiff was "able to make full fists" and had a good grip. *Id.* Although Plaintiff had "severe pain when trying to do range of motion of the hips," she was able to do the full range. *Id.* Dr. Tily opined Plaintiff was "overall stable and better since starting the Humira." *Id.*

Likewise, he determined Plaintiff was "fairly stable" on June 7, 2011. (Doc. 14-11 at 7). Dr. Tily observed Plaintiff "had fluctuating symptoms with the fibromyalgia," but her psoriatic arthritis had "overall improved." *Id.* Upon the musculoskeletal examination, Dr. Tily observed:

> She has the chronic bony deformity at the DIP and somewhat at the PIP, but she does not have any tenderness today on exam at all at the DIP, PIP, MCP. She is able to make full fists, has good grip. No tenderness at the wrist, elbow and shoulder and good range of motion at these joints. In the lower extremity, no tenderness at the MTP, no ankle effusion, no knee effusion. The fibromyalgia tender points are slightly positive.

1    *Id.* at 8.  Accordingly, Dr. Tily opined Plaintiff's arthritis was "overall significantly improved since

2    being on the Humira."  *Id.*  In addition, Plaintiff's mood was "fairly stable and better."  *Id.* at 7.

3              2.      Medical Opinions

4              Dr. Miguel Hernandez performed an internal medicine consultative examination on March 23,

5    2010.  (Doc. 14-10 at 34).  Dr. Hernandez noted Plaintiff had been diagnosed with psoriatic arthritis,

6    fibromyalgia, and rheumatoid arthritis.  *Id.*  Plaintiff told Dr. Hernandez she could "fairly do okay"

7    with standing and walking, but she would get "very tired and ha[d] to rest frequently."  *Id.* at 35.  She

8    reported being able to do "light duties around the house," and she was "able to grasp things, hold jars,

9    [and] open doors."  *Id.*  In addition, Plaintiff said she was "fine" with sitting.  *Id.*  Dr. Hernandez

10   observed Plaintiff walked into the examination without difficulty, and did not use an assistive device.

11   *Id.* at 35.  He found Plaintiff's motor strength was "5/5" and she was "able to achieve about 50 pounds

12   of pressure bilaterally" with a grip strength test.  *Id.* at 37.  Based upon the examination, Dr. Hernandez

13   determined Plaintiff was able to stand and/or walk up to six hours in an eight hour day, sit up to six

14   hours in an eight hour day, and lift and carry 50 pounds occasionally and 25 pounds frequently.  *Id.*

15   Dr. Hernandez opined Plaintiff did not have postural, manipulative, or environmental limitations.  *Id.*

16            Plaintiff had a psychiatric evaluation by Dr. Manolito Castillo on March 28, 2010.  (Doc. 14-10

17   at 39).  Dr. Castillo noted Plaintiff reported "numerous health problems that are contributing to her

18   depression and anxiety."  *Id.*  Plaintiff reported she had abused her pain medication for five years; she

19   overdosed on Soma, which resulted in a psychiatric hospitalization; and she "experience[d] severe

20   anxiety whenever she [felt] helpless."  *Id.* at 39-40.  Further, Plaintiff reported she had difficulty

21   sleeping, a poor appetite, and her "memory, concentration, and energy level" were all affected. *Id.* at

22   39.  Plaintiff reported she was able wash dishes, sweep, cook, do laundry, drive, and take care of her

23   children.  *Id.* at 41.  Dr. Castillo opined Plaintiff "was not easily distracted," and determined her

24   "memory was fair as she was able to recall three unrelated objects immediately and two objects five

25   minutes later."  *Id.* at 40.  Dr. Castillo found Plaintiff had no limitations with completing simple tasks,

26   but had moderate limitations with detailed and complex tasks.  *Id.* at 41.  In addition, Dr. Castillo

27   opined Plaintiff had slight limitations with her ability to concentrate for at least two hour increments at

28   a time to maintain a regular work schedule.  *Id.*

Dr. Ocrant completed a physical residual functional capacity assessment and case analysis on April 1, 2010. (Doc. 14-10 at 45-51). Dr. Ocrant noted Plaintiff's "[p]ain medication and/or treatment is less than aggressive," and her "current exam is normal." *Id.* at 45. However, an x-ray showed Plaintiff had mild osteoarthritis in her hands and thoracic spine. *Id.* According to Dr. Ocrant, Plaintiff was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently. *Id.* at 47. Also, Plaintiff was able to stand/and or walk for about six hours in an eight-hour day, and sit for about six hours in an eight-hour day. *Id.* He opined Plaintiff was limited to frequently climbing ramps and stairs, balancing, stooping, kneeling, and crawling. *Id.* at 49. Plaintiff could occasionally climb ladders, ropes, and scaffolds; stoop; and crouch. *Id.* Further, Dr. Ocrant determined Plaintiff was "capable of basic light handling and fingering," and had an unlimited ability to reach in all directions and feel. *Id.* This assessment was affirmed by Dr. Jackson on June 30, 2010. *Id.* at 79.

On April 8, 2010, Dr. Greg Ikawa completed a psychiatric review technique. (Doc. 14-10 at 52). Dr. Ikawa evaluated Plaintiff pursuant to Listing 12.03, schizophrenic, paranoid and other psychotic disorders; Listing 12.04, affective disorders; Listing 12.06, anxiety-related disorders; and Listing 12.09, substance addiction disorders. *Id.* According to Dr. Ikawa, Plaintiff had mild restrictions in activities of daily living; mild difficulty in maintaining social functioning; and mild difficulty in maintaining concentration, persistence, or pace. *Id.* at 60. Dr. Ikawa concluded Plaintiff failed to meet the Listing and her mental impairments were not severe. *Id.* at 52. This assessment was affirmed by Dr. Loomis on July 15, 2010. *Id.* at 79.

Plaintiff's rheumatologist, Dr. Hajra Tily completed a questionnaire on Plaintiff's impairments on September 15, 2010. (Doc. 14-10 at 86-87). He observed Plaintiff's primary impairments were psoriatic arthritis, hand deformity, chronic pain, fibromyalgia, and severe fatigue. *Id.* at 86. Dr. Tily noted x-rays showed "extensive destructive arthritis," and Plaintiff had "chronic bony deformity in [her] hands and limitation of motion of the joints with pain or attempt[s] to do range of motion." *Id.* Dr. Tily noted Plaintiff was able to lift less than five pounds frequently and "ha[d] problems using [her] hands due to deformity." *Id.* Specifically, he believed Plaintiff was able to reach, handle, feel, push, pull, or grasp "for less than an hour total with breaks in between." *Id.* at 87. Further, Dr. Tily opined Plaintiff was unable to "cope with stress due to fibromyalgia." *Id.* at 86. In an 8-hour work day, she

was able to sit for half an hour and stand/ walk for half an hour, and was required to lie down or elevate her legs "3-4 times for 15-30 minutes" each day.  *Id.*  Dr. Tily concluded Plaintiff had been unable to perform any full-time work since September 17, 2009.  *Id.*

Dr. Tily completed a second questionnaire on August 4, 2011. (Doc. 14-13 at 32-22).  He noted Plaintiff's primary impairment was psoriatic arthritis, which caused "chronic bony deformity . . . hands pain & limitation of motion in the joints."  *Id.* at 32.  Dr. Tily noted Plaintiff was able to sit, stand, or walk less than one hour in an eight-hour day, and she would "need to take frequent rests."  *Id.*  Again, he noted Plaintiff had problems using her hands and was able to lift less than five pounds.  *Id.* at 32-33.  Dr. Tily opined Plaintiff was able to spend less than 10% of an eight-hour day reaching, handling, feeling, pushing/pulling, and grasping.  Dr. Tily concluded Plaintiff was unable to perform full-time work, even at the sedentary level, and had been disabled since March 20, 2009.  *Id.* at 32-33.

**B.      Administrative Hearing Testimony**

     1.      Plaintiff's testimony

Plaintiff testified before the ALJ at an administrative hearing on August 18, 2011.  (Doc. 14-3 at 36).  She reported the highest grade of school she completed was the eleventh grade, but she acquired a GED.  *Id.* at 38.  After earning a GED, Plaintiff did on-the-job training for office work.  *Id.*

Plaintiff reported she last worked for "a restoration company," for which she "cleaned houses after a fire."  (Doc. 14-3 at 39).  Plaintiff said she stopped working in 2005 because "[i]t was difficult" to deal with "[t]he daily routine of being there at a certain time and doing the work."  *Id.*  She stated her job duties involved "[b]ending, lifting the boxes, [and] packing."  *Id.* at 40.

She believed her psoriatic arthritis and fibromyalgia caused her inability to work, and explained her fingers, knuckles, wrists, knees and back were all affected in 2005.  (Doc. 14-3 at 40).  Plaintiff estimated she could use her hands for manipulating, lifting, and/or grasping for five minutes before she had to rest her hands for "15, 20 minutes."  *Id.* at 42.  She estimated she was able to lift "[a]bout 15 pounds" at that time.  *Id.* at 41.  Further, Plaintiff reported she could stand or sit for two hours at a time on good days.  *Id.* at 41-42.  On a bad day she could only be on her feet for 30 minutes.  *Id.* at 42.

Plaintiff stated her psoriatic arthritis did not affect her skin, but was disfiguring her joints and causing boney hand deformities.  (Doc. 14-3 at 44-45).  She testified that her symptoms included being

9

swollen, stiff, and "very painful to the touch." *Id.* at 40. Plaintiff said she "constantly" had the pain and these symptoms, though there were good days and bad days. *Id.* She estimated she had five bad days each week, where her "joints are so stiff . . . so painful they don't bend." *Id.* at 41. Plaintiff reported it was difficult to carry her own weight, and on "bad days" she would "spend a lot more time with [her] feet up or changing positions." *Id.*

According to Plaintiff, the medicine she took in 2005 was the same as the medicine she was taking at the time of the hearing, but her dosage had changed. (Doc. 14-3 at 42). Plaintiff explained that she "did not have insurance in 2005," but Plaintiff was able to see a specialist after she qualified for Medi-Cal when her daughter moved in to live with her. *Id.* at 45-46. When taking the medication, Plaintiff said she her hands would shake and she was "usually very nauseated for several days" after an injection and was "battling diarrhea constantly." *Id.* at 48-49.[1] Plaintiff said the medicine made her "very drowsy" and made "it difficult to concentrate and remember." *Id.* at 49. However, as of the hearing date, Plaintiff no longer qualified for Medi-Cal and was "completely off" medication. *Id.* at 46. In addition, Plaintiff reported she had some depression and anxiety, but she never had mental health treatment. (Doc. 14-3 at 47).

### 2. Vocational expert testimony

Stephen Schmidt, a vocational expert ("VE") testified after Plaintiff at the administrative hearing. (Doc. 14-3 at 49). The VE characterized Plaintiff's past relevant work in home restoration and cleaning as heavy work. *Id.* He noted Plaintiff's work as an administrative clerk was light as defined by the *Dictionary of Occupational Titles*[2], but "heavy as performed" by Plaintiff. *Id.*

The ALJ asked the VE to consider a hypothetical individual "of the Claimant's age, education, and work experience, who is able to work, perform work at the light exertional level." (Doc. 14-3 at 49-50). Giving abilities based "roughly" off of the assessment of Dr. Ocrant, the ALJ stated the

---

[1] According to Dr. Tily, when Plaintiff stated she suffers from diarrhea, "she means loose stool rather than increased frequency or any other problems." (Doc. 14-2 at 7).

[2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dep't. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

individual could frequently climb ramps or stairs, balance, kneel or crawl; "occasionally climb up ladders, ropes or scaffolds, stoop or crouch;" was "limited to frequent bilateral handling and fingering." *Id.* at 50.  Also, the person was required to "avoid concentrated exposure to excessive vibration." *Id.*  The VE opined such a person would not be able to perform Plaintiff's past relevant work. *Id.*  However, the VE concluded the individual could perform other work at the light level, such as information clerk, *DOT* 237.367-018 and parking attendant, *DOT* 915.473-010. *Id.*

Next, the ALJ asked the VE to consider an individual who was "limited to occasional handling and fingering but the same postural limitations." (Doc. 14-3 at 50).  The VE opined there was no work available for such an individual. *Id.*

Third, the ALJ asked the VE to consider an individual who was "limited to sedentary work." (Doc. 14-3 at 50).  The VE confirmed that postural limitations were not implicated in sedentary work, because a worker is not climbing, balancing, stooping, kneeling, crouching or crawling. *Id.*  However, even if limited to sedentary work, an individual "subject to frequent handling and fingering [who] must avoid concentrated exposure to excessive vibration" would not be able to perform work. *Id.* at 51.

Finally, the ALJ asked the VE to consider an individual who "may reach, handle, feel, push, pull, grasp for less than ten percent of an eight-hour work day, [and] lift . . . no more than five pounds occasionally." (Doc. 14-3 at 51).  The VE opined such limitations would preclude all work. *Id.*

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of June 1, 2004.[3]  (Doc. 14-3 at 13).  Second, the ALJ found Plaintiff's severe impairments included: "mild osteoarthritis of the hands and spine, psoriatic arthritis, and fibromyalgia." *Id.*  Next, the ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listing. *Id.* at 14-15.  The ALJ determined:

> Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and SSR 83-10 except that: she can frequently climb ramps and stairs; balance, kneel, or crawl; she can occasionally stoop, crouch, climb ladders,

---

[3] At the administrative hearing, Plaintiff amended the application to an onset date of February 2, 2006.  (Doc. 14-3 at 51).

ropes and scaffolds; she is limited to frequent bilateral handling and fingering; and she must avoid concentrated exposure to excessive vibration.

*Id.* at 15.  With this residual functional capacity, at the fourth step the ALJ found Plaintiff was unable to perform any past relevant work.  *Id.* at 20.  However, the ALJ determined Plaintiff was able to perform "jobs that exist in significant numbers in the national economy."  *Id.* at 21.  Consequently, the ALJ concluded Plaintiff was not disabled "from June 1, 2004, through the date of th[e] decision" as defined by the Social Security Act.  *Id.* at 22.

## DISCUSSION AND ANALYSIS

### A.    Evaluation of the opinion of Dr. Tily, Plaintiff's treating physician

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. § 404.1527(d)(2).

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence."  *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

An ALJ may reject the opinion of a treating physician that is contradicted by another opinion with "specific and legitimate" reasons, supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ noted the opinion of Dr. Tily conflicted with opinions offered by other physicians.  (Doc. 14-3 at 17-18). Consequently, because "Dr. Tily's opinion [was] not given controlling weight" (*id.*), the ALJ was

1  required to identify specific and legitimate reasons supporting his decision.

2      1.    The ALJ's reasoning

3      The ALJ did not give controlling weight to the opinion of Dr. Tily because he determined "the

4  functional limitations are extreme and are inconsistent with the record as a whole, including Dr. Tily's

5  own treatment notes."  (Doc. 14-3 at 18).

6      *a.    Inconsistency with the record*

7      The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ

8  finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ

9  explains why the opinion "did not mesh with [his] objective data or history."  *Tommasetti v. Astrue*,

10  533 F.3d 1035, 1041 (9th Cir. 2008); *see also Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d

11  595, 603 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the

12  decision to discount the opinion of a physician).  Furthermore, an ALJ may reject a medical opinion

13  when it is "unsupported by the record as a whole."  *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d

14  1190, 1195 (9th Cir. 2003). Thus, if Dr. Tily's treatment notes are inconsistent with the limitations in

15  his opinion, the incongruity is a specific and legitimate reason for giving less weight to the opinion.

16      In this case, the ALJ noted that in August 2011 Dr. Tily "opined the claimant was able to

17  handle and grasp less than 10 percent of an eight-hour workday, and could perform either activity for

18  less than 30 minutes at a time."  (Doc. 14-3 at 18, citing Ex. 14F, p.2).  However, "in his most recent

19  examination notes, dated June 2011, [Dr. Tily] reported the claimant's psoriatic arthritis had improved

20  overall with Humira, and on physical examination, there was no tenderness and not much active

21  inflammation in her hands."  *Id.* at 18-19.  Dr. Tily determined Plaintiff "was able to make full fists,

22  and she had good grip."  *Id.* at 19 (citing Ex. 13F, pp 6-7).  Also, the ALJ observed Dr. Tily "noted

23  that while her fibromyalgia symptoms continued to fluctuate, [Plaintiff] had been 'fairly stable' overall

24  and had only 'slightly positive' fibromyalgia tender points on examination.  *Id.*  Accordingly, the ALJ

25  properly identified the inconsistencies between the opinion of Dr. Tily and his medical records.

26      *b.    Checklist nature of the opinion*

27      As Defendant argues, the opinion of a treating physician may be rejected when it is presented in

28  a checklist form and lacks support of clinical findings.  (Doc. 18-10, citing, *e.g., Batson*, 359 F.3d at

1195); *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (an opinion may be rejected "if

brief and conclusory in form with little in the way of clinical findings to support [its] conclusion"); SSR

96-2p, 1996 SSR LEXIS 9, at *9 (explaining the opinion of a physician is not entitled to controlling

weight when it "is not well-supported by medically acceptable clinical and laboratory diagnostic

techniques or is inconsistent with the other substantial evidence in the case record").  Here, although

the ALJ observed the opinions of Dr. Tily were "documented in two checklist-style questionnaire

forms," he did not identify this as a reason for discounting the opinion.  (*See* Doc. 14-3 at 18).  Because

the Court is constrained to *only* the reasons asserted by the ALJ, it cannot find the conclusory nature of

the forms supports the ALJ's evaluation of the opinions of Dr. Tily.  *See Connett v. Barnhart*, 340 F.3d

871, 874 (9th Cir. 2003) (noting that a reviewing court "is constrained to review the reasons the ALJ

asserts").

Nevertheless, the ALJ identified evidence in the medical record—including Dr. Tily's own

treatment notes—which was inconsistent with the limitations set forth by Dr. Tily.  Accordingly, the

ALJ set forth specific, legitimate reasons for giving less than controlling weight to the opinions.

*Tommasetti*, 533 F.3d at 1041; *Batson*, 359 F.3d at 1195.

### 2.    Substantial evidence supports the determination

The ALJ's decision to give less weight to the opinions of Dr. Tily is supported by substantial

evidence in the record. In a Social Security Ruling[4], the Commissioner explained the term "substantial

evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent

with the opinion need not prove by a preponderance that the opinion is wrong." 1996 SSR LEXIS 9 at

*8. Rather, "[i]t need only be such relevant evidence as a reasonable mind would accept as adequate to

support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

Significantly, the opinion of an examining physician may be substantial evidence in support of

the ALJ's decision when the opinion is based upon independent clinical findings. *Orn v. Astrue*, 495

F.3d 625, 632 (9th Cir. 2007); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  As the ALJ

---

[4] Social Security Rulings are issued by the Commissioner to clarify its polices and the regulations.  Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882. F.2d 1453, 1457 (9th Cir. 1989).

14

noted, Dr. Hernandez conducted a physical examination with "unremarkable" findings, "including generalized muscle tone throughout both the upper and lower extremities bilaterally and no tenderness to the paraspinal muscles at several locations." (Doc. 14-3 at 18, citing Doc. 14-10 at 34-37). Also, Dr. Hernandez performed a grip strength test and determined Plaintiff's motor strength was "5/5." (Doc. 14-10 at 37). Because the opinion of Dr. Hernandez was based upon independent clinical findings, it is substantial evidence in support of the ALJ's determination that Plaintiff was able to perform "frequent bilateral handing and fingering." In addition, the opinions of Drs. Ocrant and Jackson, who examined the record and determined Plaintiff was "capable of basic light handling and fingering" (Doc. 14-10 at 49, 79), are consistent with the opinion of Dr. Hernandez. Thus, the opinions of Drs. Ocrant and Jackson are substantial evidence in support of the ALJ's evaluation of the evidence. *See Tonapetyan*, 242 F.3d at 1149 (explaining the "opinion of a non-examining medical expert … may constitute substantial evidence when it is consistent with other independent evidence in the record").

Though the medical evidence may be "susceptible to more than one rational interpretation," the ALJ set forth specific, legitimate reasons to give less weight to the opinion of Plaintiff's treating physician, and the decision is supported by substantial evidence in the record. Therefore, the Court must uphold the ALJ's evaluation of the medical evidence. *See Orn*, 495 F.3d at 630; *see also Matney*, 981 F.2d at 1019.

**B.     The ALJ's credibility determination**

To evaluate a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160

(9th Cir. 2008).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness; (2) the claimant's daily activities; (3) inconsistencies in testimony or between testimony and conduct; (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed treatment; and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

Here, the ALJ determined Plaintiff was "less than fully credible."  (Doc. 14-3 at 20).  According to the ALJ, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  *Id.* at 16.  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible."  *Id*. at 17.  Supporting these findings, the ALJ considered Plaintiff's inconsistent statements and objective medical evidence.

### 1.      Inconsistent statements

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). In this case, the ALJ observed: "although [Plaintiff] testified to numerous medication side effects, the only side effect reported in the most recent treatment note is a few days of nausea following Humira injections, which [she] found tolerable because of the benefits afforded by the medication." (Doc. 14-3 at 17) (citing Doc. 14-11 at 8).  Indeed, at the hearing Plaintiff testified her medicine caused her hands to shake, drowsiness, an inability to concentrate, diarrhea, and vomiting.  (Doc. 14-3 at 48-49). The inconsistencies in Plaintiff's comments regarding the side effects of her medication was an appropriate consideration as part of the credibility determination.[5]  *Smolen*, 80 F.3d at 1284.

///

---

[5] Notably, as part of a credibility determination, an ALJ may consider also "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c).  Accordingly, the minimal side effects Plaintiff experienced as a result of her medication and her willingness to tolerate the side effect (*see* Doc. 14-11 at 8, 25) was also a relevant consideration by the ALJ as part of the credibility evaluation.

2.     Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis").

In this case, the ALJ did not base the credibility evaluation solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff.  Thus, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.  However, in citing to the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that Plaintiff's testimony is contradicted by the record.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  The ALJ observed Plaintiff "testified that her condition had 'definitely gotten worse' since 2005, but the most recent examination note from her treating physician, dated June 2011 … indicated overall stability and significant improvement." (Doc. 14-3 at 20).  As discussed above, "Dr. Tily noted she had been 'fairly stable' overall" and that Plaintiff's "psoriatic arthritis had improved overall with Humira treatment."  *Id.* at 18.

Although Plaintiff asserts the ALJ "did not state what specific evidence undermined [her] claims that due to bony deformities in the hands and the arthritic processes underlying them, she had manual use limitations that would affect full time work" (Doc. 15 at 10), the ALJ discussed the medical evidence related to the "bony deformities."  Specifically, the ALJ observed that despite the "musculoskeletal examination [which] indicated chronic bony deformity and 'slightly positive' fibromyalgia points,[] there was no tenderness and not much active inflammation in her hands."  (Doc. 14-3 at 18).  In addition, the ALJ noted Plaintiff "was able to make full fists and had good grip; there

1   was good range of motion and no tenderness at the wrist, elbow, and shoulder . . ." *Id.* (citing Doc. 14-

2   11 at 8).  Accordingly, contrary to Plaintiff's assertion, the ALJ properly identified "what evidence

3   undermines the testimony," and the objective medical evidence supports the ALJ's adverse credibility

4   determination.  *See Holohan*, 246 F.3d at 1208.

5   **C.      Vocational expert testimony**

6           Plaintiff contends the ALJ erred in relying upon the testimony of the vocational expert, because

7   the hypothetical did not include limitations based upon Plaintiff's subjective complaints, and was not

8   complete "without manual limitations derived from bony deformities and arthritis in the hands."  (Doc.

9   15 at 10).  As a result, Plaintiff argues the testimony cannot support the ALJ's finding that Plaintiff is

10  able to perform work in the national economy.  *Id.*

11          An ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or her

12  functional capacity, would be able to do; and (2) the availability of such jobs in the national economy."

13  *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  When eliciting testimony from a vocational

14  expert, the ALJ must set forth "hypothetical questions to the vocational expert that 'set out all of the

15  claimant's impairments' for the vocational expert's consideration."  *Id.* (quoting *Gamer v. Sec'y of*

16  *Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)).  Only limitations supported by

17  substantial evidence must be included.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006);

18  *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). "If the assumptions in the hypothetical are

19  not supported by the record, the opinion of the vocational expert that the claimant has a residual

20  working capacity has no evidentiary value."  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

21          As discussed above, the ALJ properly determined Plaintiff's subjective complaints lacked

22  credibility. Thus, the ALJ was not required to set forth a hypothetical question for the vocational expert

23  based upon her complaints.  The ALJ asked the VE to consider an individual who was able to perform

24  light work, and was able to frequently climb ramps or stairs, balance, kneel or crawl; "occasionally

25  climb up ladders, ropes or scaffolds, stoop or crouch;" was "limited to frequent bilateral handling and

26  fingering."  (Doc. 14-3 at 50).  Also, the person was required to "avoid concentrated exposure to

27  excessive vibration."  *Id.*  The VE concluded the person could perform work in the national economy

28  such as information clerk and parking attendant.  *Id.*

Importantly, the limitations considered by the vocational expert were adopted by the ALJ, and were supported by substantial evidence in the record, including the opinions of Drs. Hernandez, Ocrant, and Jackson.  Because the "weight of the medical evidence supports the hypothetical questions posed by the ALJ," the testimony of vocational supports the ALJ's step-five determination that Plaintiff is able to perform work in the national economy.  *See Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (an ALJ can satisfy the burden at step five if the vocational expert testifies in response to a question "that reflects all the claimant's limitations"). Accordingly, the analysis at step five was proper.

**D.    Evidence presented to the Appeals Council**

Plaintiff submitted additional medical evidence to the Appeals Council, including a consultative examination report and psychiatric review technique by Dr. Robert Morgan dated January 9, 2012. (Doc. 14-13 at 34-47).  Dr. Morgan observed Plaintiff was "severely depressed, discouraged and withdrawn and most likely meets criteria for major depressive episode." *Id.* at 41.  He opined Plaintiff was "presenting with a marked impairment in her ability to maintain her activities of daily living," "marked impairment in social functioning," and "marked impairment in her concentration, persistence, and pace." *Id.* at 42-43."  Further, Dr. Morgan noted Plaintiff had "one episode of decompensation in a work like situation." *Id.* at 43. Accordingly, Dr. Morgan concluded Plaintiff satisfied the criteria for Listing 12.04.  The Appeals Council "found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Doc. 14-3 at 2-4).  Concluding the ALJ's decision was not "contrary to the weight of all the evidence now in the record," the Appeals Council denied Plaintiff's request for review.  *Id.* at 2.

Plaintiff argues the report from Dr. Morgan warrants a remand because "[t]he Appeals Council gave no reasons to reject this opinion and, by necessity, neither did the ALJ who did not see it."  (Doc. 15 at 7).  Plaintiff contends that as a result, "the Commissioner's final decision is deficient here because it did not include specific and legitimate reasons to reject Dr. Morgan's opinion." *Id.* at 7.  Further, Plaintiff argues that the Appeals Council "acknowledged [Dr. Morgan's report] related to the period at issue; otherwise the Appeals Council would have had to return this evidence to Plaintiff." *Id.* at 6 (citing 20 C.F.R. §§ 404.1476, 416.976).

On the other hand, Defendant argues Dr. Morgan's opinion "was neither persuasive, nor material because (1) it was inconsistent with the medical evidence; (2) it provided a current picture of Plaintiff's condition after she stopped her medications; and (3) it was obtained by Plaintiff only after the ALJ issued an adverse determination."  (Doc. 18 at 8) (citing *Weetman v. Sullivan*, 877 F.2d 20, 23 (9th Cir. 1989) (doctor's opinion "is all the less persuasive since it was obtained by [claimant] only after the ALJ issued an adverse determination").  Therefore, Defendant concludes the Appeals Council properly determined that "Dr. Morgan's opinion did not provide a basis for changing the ALJ's decision."  *Id.* (emphasis omitted).

In the Ninth Circuit, "when a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).  Because the Appeals Council incorporated the evidence from Dr. Morgan into the record, the Court must consider his opinion in determining whether the ALJ's decision is supported by substantial evidence.  *Brewes,* 682 F.3d at 1160, 1163.

Recently, this Court explained additional evidence presented to the Appeals Council "does not warrant reversal" of an ALJ's opinion where the additional evidence postdates the decision of the ALJ. *Vernon v. Astrue*, 2013 U.S. Dist. LEXIS 23354 at *33-34, 2013 WL 632261 at *12 (E.D. Cal. Feb. 29, 2013).  Likewise, the Central District has determined "additional evidence . . . does not warrant reversal because it postdated the ALJ's decision."  *Calvey v. Astrue*, 2013 U.S. Dist. LEXIS 7398 at *13, 2013 WL 180033 at *4 (C.D. Cal. Jan. 17, 2013).  In *Vernon*, the Court observed: "Although Plaintiff claims that [the additional evidence] is relevant to the period on or before the hearing date, nothing in the evidence contains a retrospective analysis of Plaintiff's condition before the date of the ALJ's decision. Indeed, Plaintiff does not point to any portions of the new evidence that she contends retrospectively analyzes her condition."  *Id.* at 33 (internal citation omitted). As a result, the Court concluded the evidence was not material and should be given "little weight." *Id.* (citing 20 C.F.R. § 416.1470(b); *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988).

Significantly, the facts now before the Court are similar to those addressed in *Vernon*. The mental health examination by Dr. Morgan occurred January 9, 2012, after the ALJ issued his adverse decision.  Although Plaintiff argues the opinion relates to her condition prior to the decision, she does not identify any evidence supporting this assertion and Dr. Morgan's assessment is written in the present tense.  (Doc. 14-13 at 36) (*see also id.* at 39, 41) (discussing Plaintiff's "current level of functioning" and the psychological assessment results).  Moreover, Dr. Morgan indicated he did not review any medical records, and his assessment was based entirely upon the credibility of Plaintiff's subjective complaints, which were rejected by the ALJ.  Thus, the opinion of Dr. Morgan is entitled to little weight and does not warrant a remand for consideration by the ALJ.  *See Vernon*, 2013 U.S. Dist. LEXIS 23354, at *33-34; *Calvey*, 2013 U.S. Dist. LEXIS 7398 at *13.

Considering the evidence as a whole, the opinion of Dr. Morgan does not change the fact that substantial evidence supports the ALJ's determination that Plaintiff was "not under a disability, as defined in the Social Security Act, from June 1, 2004 through the date of th[e] decision," September 15, 2011.  As the ALJ observed:

> In February 2009, [Plaintiff] reported her mood had improved after taking Cymbalta for one month.  (Ex. 1F, p. 108).  Her primary care doctor continued to monitor and adjust her medication, and related examination findings were mostly unremarkable. (Exs. 1F, pp. 7, 10, 47, 56; 13F, pp. 100, 101). In January 2010, the claimant indicated her anxiety and depression had been much better since Xanax, which she was taking as needed, was prescribed. (Exs. 1F, pp. 7; 13F, pp. 100-101). Her treating physician noted in December 2010 that her depression was controlled with medication, and in June 2011 that her mood was fairly stable and better.  (Ex. 13F, pp. 7, 27).

(Doc. 14-3 at 14).  The ALJ noted Dr. Castillo, an examining physician, determined Plaintiff had generally "unremarkable" findings upon her mental health examination.  *Id.*  Further, Drs. Ikawa and Loomis, non-examining physicians, determined Plaintiff had mild restrictions in activities of daily living; mild difficulty in maintaining social functioning; and mild difficulty in maintaining concentration, persistence, or pace.  *Id.* at 14-15.  Consequently, the opinions of these three physicians support the ALJ's evaluation, and his conclusion that Plaintiff's mental impairment was not severe though the date of the decision is supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Tonapetyan*, 242 F.3d at 1149.

///

21

## **FINDINGS AND RECOMMENDATIONS**

The ALJ set forth specific, legitimate reasons for giving less than controlling weight to the opinion of Plaintiff's treating physician.  In addition, the ALJ identified clear and convincing reasons for discounting the credibility of Plaintiff's subjective complaints.  Because the subjective complaints were properly rejected, the ALJ was not required to adopt the testimony of the vocational expert based upon these limitations.  Finally, the additional evidence presented by Plaintiff to the Appeals Council does not warrant a remand.

The Ninth Circuit explained, "The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Matney*, 981 F.2d at 1019; *see also Thomas*, 278 F.3d at 954 ("[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld").  Thus, because the ALJ applied the proper legal standards and his evaluation of the evidence is supported by substantial evidence in the record, his conclusion that Plaintiff was not disabled through the date of his decision should be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY RECOMMENDED**:

1.      The decision of the Commissioner of Social Security be **AFFIRMED**; and

2.      The Clerk of Court be directed to enter judgment in favor of Defendant, Commissioner of Social Security, and against Plaintiff Victoria Best.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days of the date of service of these Findings and Recommendations, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the Objections shall be filed and served within 14 days of the date of service of the Objections.

///

///

22

The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __**July 22, 2013**__                    _____**/s/ Jennifer L. Thurston**_
                                        UNITED STATES MAGISTRATE JUDGE